Filed 6/24/13  P. v. Benitez CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHN GILBERT BENITEZ,<br><br>    Defendant and Appellant. | B243018<br><br>(Los Angeles County<br>Super. Ct. No. GA084254) |

APPEAL from a judgment of the Superior Court of Los Angeles County,

Michael D. Carter, Judge.  Affirmed.

Jamilla Moore, under appointment by the Court of Appeal, for Defendant and

Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, John Gilbert Benitez, appeals from the judgment entered following a jury trial which resulted in his conviction of simple battery (Pen. Code, § 242)[1] and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), during the commission of which he personally inflicted great bodily injury upon the victim who was not an accomplice to the offense (§ 12022.7, subd. (a)). The trial court awarded Benitez five years probation, one condition of which was that he serve the first 240 days in county jail. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*.

   a. *The prosecution's case*.

In September 2011, Jannell Garkow had worked for almost two years in a "beer bar" called The Bit on Live Oak Avenue in Arcadia. Garkow knew Benitez as a regular customer at the bar. Garkow also recognized a man named Steve Wyatt as a customer who came into the bar "once in a while."

Garkow was working at the bar on the night of September 10, 2011. When she started her shift at 6:00 p.m., Benitez was already there. Before Wyatt arrived at approximately 10:00 p.m., Garkow had served Benitez between three and five beers. When he got to the bar, Wyatt ordered a beer. However before he could drink it, a fight broke out between the two men. Garkow did not see how the fight began, but when she heard a noise, she turned and saw that Wyatt had "fallen back on the bar." When Wyatt

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

got up, Benitez grabbed him by the neck or throat and started to hit Wyatt with his hand. Wyatt's girlfriend approached Benitez and he hit her in the face with his fist. In the meantime, Wyatt, who had fallen to his knees, attempted to get up. Benitez, however, kicked Wyatt, who then lost consciousness for a short time. At this point, Garkow walked around the bar, approached Benitez and told him to leave. Although it took awhile, Benitez "left eventually." Garkow then noticed Wyatt was "bleeding from his head and his nose" and "[t]here was blood all over[.]" Wyatt indicated he was "a little dizzy [and was acting as though] he wasn't sure what [had] happened."

The bar has video surveillance cameras and a CD made from several of the videos taken during the altercation between Benitez and Wyatt showed "contact" between the two men. The CD showed Benitez push Wyatt, then showed Wyatt "get up and go towards [Benitez] and [Benitez] put his . . . arm . . . around" Wyatt's neck. Although Garkow did not recognize Wyatt in the CD, she believed it showed him falling because she had actually seen him "fall down."

After Benitez left the bar, Garkow, Wyatt's daughter and another customer took Wyatt to the men's bathroom and, using a wet towel, attempted to "clean him up." Wyatt asked them, " 'What happened? Why did he do that?' " A few minutes later, sheriff's deputies arrived at the bar.

Steve Wyatt remembered going to The Bit on September 10, 2011. When he arrived at the bar, Wyatt saw Benitez. Wyatt had seen Benitez on prior occasions, but had never had a conversation with him.

3

When Wyatt first arrived at The Bit on September 10, 2011, he and his girlfriend, Maryann Rivera, sat down at the bar and Wyatt ordered a beer. Wyatt then went to the restroom. Wyatt's daughter was supposed to meet Wyatt at the bar and, as he was walking back from the restroom he was reading a text message he had received from her. Because he was looking at his phone, Wyatt did not see Benitez and the two men bumped into each other. Benitez said something to Wyatt which Wyatt did not understand, then "gave [Wyatt] a two-hand shove" in the shoulders. Wyatt "flew up against the bar next to [his] girlfriend[,] . . . put [his] phone down" and said " 'What the "F"?' " When he then got up and moved toward Benitez, Benitez "punched [Wyatt] in the face." The next thing Wyatt remembered was "[b]eing picked up off the ground." He was bleeding and someone had handed him a towel from the bar. Wyatt remembered "being in the bathroom and looking in the mirror and wiping [his] face off with the towel." After he came out of the bathroom, Wyatt, who was "[d]azed and confused," asked his girlfriend, Rivera, who had called 911, "what [had] happened."

As a result of the altercation, Wyatt was required to have 12 stitches around his eye, suffered a laceration on his nose, had bruises around his neck and a black eye. In terms of "lasting" effects, Wyatt attributed the fact he sometimes has "foggy days," or days when "things are [not] as clear as they used to be," to the injuries suffered during the altercation with Benitez. Moreover, Wyatt's eye did not heal "correctly." According to Wyatt, "[i]t stayed swollen and continued to ooze liquid" for approximately four months. Wyatt also suffers from headaches and dizziness. These symptoms occur approximately

4

once a week and affect his ability to walk and drive. Finally, Wyatt has an approximately three-eighths inch scar on his nose and two "jagged" scars, each of which is between one-half and three-quarters of an inch long, on his "eyebrow area."

Deputy Sheriff Kyle Otis of the Los Angeles County Sheriff's Department and his partner, Deputy Mikesell, were on patrol in a marked car when, at approximately 10:30 p.m. on September 10, 2011, they responded to a call directing them to The Bit bar. There, Otis saw Benitez, who had been "detained pending an investigation." Benitez was hand-cuffed, taken into custody and placed in the back seat of a patrol car. There, Otis advised him of his rights pursuant to *Miranda*[2] and, after Benitez indicated that he understood those rights, he told Otis he had been "attacked by a White male who punched him in the right eye and he defended himself." Benitez also indicated a White female had "c[o]me at him" and he had again defended himself.

While at the bar, Otis had observed Wyatt's wounds. The deputy "saw a laceration over [Wyatt's] left eye split open" and "he was bleeding profusely. [Wyatt also] had . . . some kind of a knot on his nose."

Benitez was transported to the jail, where Otis went through "his articles of clothing [and] items of property." Otis noticed there was blood on Benitez's shoes and socks.

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

5

b. *Defense evidence*.

Benitez testified he works as an "umpire and a day trader." On September 10, 2011, Benitez went to a bar called The Bit in Arcadia. Benitez had drunk two or three beers and had ordered another one while he was practicing at the shuffleboard table. After throwing down a puck, he had backed up slowly. Benitez and Wyatt, whom Benitez had never met before, "bumped into each other." Wyatt said something which Benitez did not understand and when Benitez asked for an explanation, Wyatt cursed at him and "sprayed [him] with spit." Benitez pushed Wyatt with his right hand, then stepped back to avoid any "trouble." Wyatt, however, fell back into the bar stools and, when Benitez looked in that direction, he saw Wyatt place his cell phone on the bar, then approach Benitez with a closed fist. Although he had hoped that the altercation was over, at that point, Benitez "knew . . . [he] had to defend [him]self because [he] had no other choice, and [he] swung back" at Wyatt. Wyatt hit Benitez in his right cheek, causing it to bruise. Benitez then picked up Wyatt and "[wrestled] him to the ground." As they were fighting, Wyatt's girlfriend, Rivera, approached Benitez and kicked him in the left leg. Wyatt, who was by this time on his knees, grabbed Benitez by both his legs. After Benitez, who was still standing, was able to free his right leg from Wyatt's grasp, he "backed up and . . . kick[ed] [Wyatt]." Benitez then walked out of the bar through the back entrance.

Benitez had "punched" Wyatt because "he was coming at [Benitez] in a threatening manner [with] a closed hand fist." Benitez felt Wyatt was going to hurt him and he had to defend himself.

With regard to the blood found on his shoes and socks, Benitez explained: "Well, Mr. Wyatt had me by the legs and blood was on my thigh dripping down towards my sock, and it pooled . . . on the top of my sock and was just dripping down." Benitez also testified that, contrary to the deputy's testimony, Otis did not interview him at the scene. The deputy simply handcuffed him and placed him in the back seat of a patrol car.

Rosanne Velarde had met Benitez through her husband approximately 15 years earlier. She considered Benitez a friend. They had been to each other's homes and saw each other approximately once a week. Velarde considered Benitez a "gentle man" who did not get angry easily. In the 15 years she had known him, Velarde had never seen Benitez become violent.

Brandon Cascarano knew Benitez because they both frequented The Bit bar. Cascarano was at the bar on the evening of September 10, 2011 and he saw some of the fight between Benitez and Wyatt. Cascarano was at the bar, facing the bar, when he heard a commotion and voices. When he turned to see what was happening, Cascarano saw Wyatt moving toward Benitez with his arm bent as though "he was going for a punch." Wyatt punched Benitez, who then hit Wyatt back. The two men were punching at and wrestling with each other. Cascarano, who saw blood after the two men started to hit one another, also saw Wyatt holding Benitez by the knees. Benitez broke free of

7

Wyatt's grasp by backing up and "kind of kick[ing his leg] away from [Wyatt]." After he had freed himself from Wyatt's grip, Benitez walked out the bar's back entrance.

2. *Procedural history.*

Following a preliminary hearing, on May 15, 2012 an amended information was filed, the first count of which alleged that on September 10, 2011 Benitez committed the crime of battery with serious bodily injury, a felony in violation of section 243, subdivision (d). It was further alleged with regard to that count that the offense was a serious felony (§ 1192.7, subd. (c)) requiring registration (§ 290, subd. (c)) and that time imposed for the offense was to be served in state prison (§ 1170, subd. (h)(3)). In the second count it was alleged that, on or about September 10, 2011, Benitez committed assault by means of force likely to produce great bodily injury, a felony (§ 245, subd. (a)(1)). It was further alleged as to that count that, because Benitez had personally inflicted on the victim great bodily injury (§ 12022.7, subd. (a)), the offense was a serious felony (§ 1192.7, subd. (c)(8)).

Before trial it was determined that Benitez faced a term of seven years in prison. The People had made Benitez an offer of five years of formal probation, one condition of which would be that he serve one year in county jail. Defense counsel indicated that Benitez had counter-offered with a plea to misdemeanor battery and "straight probation," an offer the prosecution was not willing to accept.

At an Evidence Code section 402 hearing, the district attorney indicated Benitez had suffered a conviction for violating section 415 in 2006.[3]  However, since the prosecutor did not know the facts underlying the conviction, the trial court determined the conviction "ha[d] no validity" or "weight."  In addition, it could be prejudicial.  The jury might conclude that, because Benitez had a prior misdemeanor conviction, "he [might] be more likely to be guilty of [the present offense]."

At the same proceedings, the prosecutor disclosed that she had just recently learned the victim in this matter had been arrested in 1982 for committing battery in violation of section 242 and had been subsequently convicted of violating section 415.  Defense counsel, the prosecutor and the trial court all agreed that the conviction was too remote to be relevant and, accordingly, it would not be mentioned at trial.

With regard to Wyatt's medical records, the trial court determined only portions of the records would be allowed into evidence because much of the information contained in them amounted to inadmissible hearsay.  The prosecutor and defense counsel agreed to prepare a stipulation regarding which portions of Wyatt's records would be presented to the jury.  However, there was one aspect of the records on which counsel could not agree.  It was indicated a CT scan showed Wyatt had suffered "a fracture of the superior aspect of the nasal bone, but" it was "of uncertain age [although it] could be relatively acute."  The prosecutor asserted, although one could not tell from the report how old the injury

---

[3]    Section 415 prohibits unlawfully fighting or challenging another person to fight in a public place, maliciously and willfully disturbing another by loud and unreasonable noise and using offensive words which are inherently likely to provoke an immediate, violent reaction in a public place.

was, since the report indicated it "could be relatively acute," it should be allowed. The fracture could easily have resulted from the incident involving Benitez. Defense counsel, on the other hand, argued the evidence was "speculative." Counsel indicated there was no expert testimony indicating the fracture "resulted from the 9/10/201[1] incident." Counsel continued, "It's simply a remark there is evidence in a CT scan of a fracture of uncertain date. I think its prejudicial effect . . . outweighs any probative [value]." The trial court determined, pursuant to Evidence Code section 352, the probative value of the evidence outweighed any prejudicial effect it might have "because [it] seem[ed] to be a neutral sentence that [could] be argued by both sides." The court indicated it would allow the evidence to be presented at trial.[4]

After the prosecution presented its case, defense counsel moved for "a judgment of acquittal for insufficiency of the evidence[.]" (§ 1118.1.) Counsel argued the testimony had not been convincing and the CD simply showed "people wrestling on the

---

[4] The stipulation read in relevant part: "[T]hat Steve Wyatt was treated by Dr. Ivan Rokos at Methodist Hospital. That he was admitted at 12:37 a.m. on September 11, 2011. That the results of the physical exam were as follows: [¶] His face [was] significant for irregularly shaped stellate . . . laceration of his left eyebrow extending into his left eyelid. This wound [was] about three centimeters long. The nose ha[d] an abrasion in the mid aspect . . . , but there [was] no active nasal bleeding. . . . [¶] Mr. Wyatt was diagnosed as having an open wound of the forehead in the area of the left eyebrow and a nose abrasion. He received 12 stitches in his left eyebrow area. [¶] A CT scan was performed and the results were examined by Dr. Leon Lis. The scan showed some focal soft tissue swelling along the left lateral orbit area with tiny air bubbles in the soft tissues consistent with the history of a laceration. The eyeball itself appear[ed] intact. The CT scan also showed a fracture of the superior aspect of the nasal bone, but this [was] only partially included [in] the study. [The fracture] is of uncertain age, but could [have been] relatively acute."

10

floor." Counsel indicated, at worst, "this [case presented] mutual combat." The prosecutor opposed the motion, asserting "there [was] no evidence . . . Mr. Wyatt ever punched Mr. Benitez." The trial court denied the motion "based on the evidence . . . presented thus far . . . ."

After hearing the trial court's instructions and argument by the parties, the jury retired to deliberate on the afternoon of May 17, 2012. At 12:11 p.m. on May 18, 2012, the jury foreperson informed the trial court the jury had reached verdicts. After the foreperson handed the verdict forms to the bailiff, who in turn handed them to the court, the trial court indicated it "need[ed] to have the jury go back and take a look at the verdict forms." The court stated it wanted the jury to "take a look" at the forms, then referred the jury to "jury instruction 3517."[5]

Several minutes later, at 12:21 p.m., the jury returned to the courtroom. The foreperson handed the verdict forms to the bailiff, who in turn handed them to the court. The trial court then instructed the court clerk to read the verdicts. With regard to count 1, the clerk read: [¶] "We, the jury, . . . find the defendant, John Gilbert Benitez, not guilty of battery with serious bodily injury upon the person of Steve Wyatt in violation of . . . section 243[, subdivision] (d) . . . ." The clerk continued, "Same title of court and cause, count 1, verdict: [¶] We, the jury, . . . having found the defendant not guilty of battery

---

[5] Jury Instruction No. 3517 reads in relevant part: "If all of you find that the defendant is not guilty of a greater crime, you may find him guilty of a lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime. A defendant may not be convicted of both a greater and lesser crime for the same conduct."

11

with serious bodily injury, find the defendant, John Gilbert Benitez, guilty of simple battery in that he did willfully and unlawfully use force and violence upon the person of Steve Wyatt in violation of . . . section 242, a lesser crime than that charged in count 1 of the information."

With regard to count 2, the court clerk read: "We, the jury, in the above-entitled cause, find the defendant, John Gilbert Benitez, guilty of assault by means likely to produce great bodily injury on Steve Wyatt in violation of . . . section 245[, subdivision] (a)(1) . . . . [¶] Further, we find true the allegation pursuant to . . . section 12022.7[, subdivision] (a) that in the commission of the above offense the defendant personally inflicted great bodily injury upon Steve Wyatt not an accomplice to the . . . offense."

The clerk then polled the jury and, when asked, each of the 12 jurors indicated these were their verdicts.

The trial court set sentencing for June 7, 2012, remanded Benitez with no bail and ordered a probation and sentencing report. At proceedings held on June 11, 2012, the trial court indicated it had "read and considered all of the declarations filed, along with the People's Sentencing Memo and the Defense Statement in Mitigation, Statement in Support of Probation, and Notice of Motion to Strike the Enhancement and Punishment." The court then heard oral argument from both the People and defense counsel. The prosecutor asserted the crime had involved great violence and the victim suffered great bodily harm. In addition, Benitez "endangered the safety of the numerous innocent bystanders." However, the prosecutor indicated that "[i]n light of the fact . . . the

12

defendant [had no] other substantial criminal history or felonies, the People [were] recommending [the] midterm [of six years in state prison] instead of [the] high term . . . ."

Defense counsel presented to the court Ulysses Gutierrez, a minister and director of a Los Angeles County program which provides probationers with "probation services and/or rehabilitation services." Gutierrez indicated Benitez would be eligible for the services, which included everything from "recovery program[s]" to programs "dealing with anger management." Gutierrez explained: "Our final goal is to work with the client and the family to develop a comprehensive developmental plan. The plan stipulates that the client has to report to us three times a week. Based on the client's needs, that could also include drug testing through one of the agencies in our network."

Benitez then addressed the court. He stated, in relevant part: "My intentions were not to injure anybody, and I feel bad that Mr. Wyatt was injured. I don't know if he received the information from the later point of the incident where I had called to make sure he was okay and I returned back to the bar to check and confront the sheriff to make sure everything was okay. And I tried to do it like a man, do the right thing. [¶] And just reflecting on that, I am hoping . . . you find it in your heart that I'm not a violent man. I was trying to do the right thing. And in this case the jury decided and not in my favor, so I am here at your mercy and hoping you would see that and you would view that and read that." Defense counsel then addressed the court and indicated "[p]robation [was] the right thing to do." Counsel continued, "This man has a negligible history of

any contact with law enforcement or any criminal history.  His behavior over the years has been unremarkable as far as the criminal justice system [is concerned].  He deserves a chance to show this was an isolated incident . . . ."

After indicating this was not a "state prison" case, the trial court suspended imposition of sentence and placed Benitez on probation for a period of five years, one condition of which was that he serve the first 240 days in county jail.  The court then awarded Benitez presentence custody credit for 30 days actually served and 30 days of good time/work time.  The trial court ordered Benitez to pay a $200 restitution fine (§ 1202.4, subd. (b)), a stayed $200 probation revocation restitution fine (§ 1202.44), a $40 court security assessment (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction assessment (Gov. Code, § 70373).  The trial court stayed imposition of punishment on the great bodily injury enhancement and awarded Benitez 180 days of probation, the time to run concurrently with that imposed for the felony, for Benitez's conviction of the misdemeanor of simple battery.  After setting a hearing at which it would be determined how much restitution Benitez would be required to pay for the victim's injuries, the trial court informed Benitez of the conditions of his probation, then ended the proceedings.

Benitez filed a timely notice of appeal on August 2, 2012.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record.

14

By notice filed April 5, 2013, the clerk of this court advised Benitez to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider.  No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities.  (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


CROSKEY, J.


We concur:


KLEIN, P. J.


KITCHING, J.


15